IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL KEITH ALEXANDER, <br><br>       Petitioner, <br><br>     vs. <br><br> ERIC ARNOLD, Warden, California State Prison, Solano,[1] <br><br>       Respondent. | No. 2:14-cv-00644-JKS <br><br> MEMORANDUM DECISION |

Darryl Keith Alexander, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Alexander is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at California State Prison, Solano. Respondent has answered, and Alexander has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On May 20, 2011, Alexander was charged with second-degree murder (count 1), gross vehicular manslaughter while intoxicated (count 2), gross vehicular manslaughter while intoxicated without gross negligence (count 3), felony hit and run (count 4), felony driving under the influence of alcohol (count 5), felony driving with a blood alcohol content exceeding 0.08 percent (count 6), and misdemeanor driving on a suspended license (count 7). The information also alleged as to count 2 that Alexander had three prior drunk driving convictions, and, as to counts 2 and 3, that Alexander had fled the scene of the crime. The information further alleged

_____

[1] Eric Arnold is substituted for G. Swarthout as Warden, California State Prison, Solano. FED. R. CIV. P. 25(d).

as to counts 1 through 6 that Alexander had previously been convicted of residential burglary

and assault with a deadly weapon and had served a prison sentence for grand theft.  On direct

appeal of his conviction, the Court of Appeal described the following facts underlying the

charges against Alexander and recounted the procedural history of Alexander's case:

> [Alexander], inebriated, backed up a motor home, hitting Ginger Ball, a woman with whom he was having a romantic relationship.  After attempting to pull Ball's body out from under the vehicle's wheel, [Alexander] drove away, running over Ball once again.  After [Alexander] abandoned the vehicle, officers arrested him.
> . . . .
> [Alexander] waived his right to a jury trial and agreed to a court trial.  The following evidence was introduced at trial.

**Prosecution's Case**

***The Incident***
> One summer day in 2010 Louise Bristow, who was homeless and living in her car, took her friend Ginger Ball to the bank to withdraw money.  Ball was in a romantic relationship with [Alexander], and both were also homeless.  After leaving the bank, Bristow dropped off Ball and picked up [Alexander].  She drove [Alexander] to his parents' home, where he would use Ball's money to buy a motor home.
> Later that evening, in the area where she parked her car, Bristow saw a motor home pull up, driven by someone named Shorty.  Shorty, Ball, [Alexander], and Shorty's girlfriend got out of the motor home.  [Alexander] appeared intoxicated: he stumbled, slurred his words, and smelled of alcohol.
> Ball and [Alexander] went into the motor home and an argument broke out between them.  Ball left the vehicle and walked behind it with Bristow and Shorty's girlfriend.  [Alexander] began arguing with Shorty, who had been sitting in the driver's seat.  Shorty got out of the motor home.
> Rickey Henderson, sitting in a car nearby, saw [Alexander] arguing with two men in the middle of the street.  Henderson got out of his car and went up to the group.  Henderson wrestled with [Alexander] for a short time and then returned to his car.  He observed [Alexander] return to the motor home.
> [Alexander] sat in the driver's seat and attempted to start the motor home.  Bristow, standing behind the motor home, heard the gears grinding as [Alexander] started the engine, revved it, and released the clutch.
> The motor home lurched backwards towards Bristow, Ball, and Shorty's girlfriend.  The trio stood approximately three feet behind the motor home.  As the motor home moved toward them, Bristow jumped to the middle of the street and Shorty's girlfriend jumped to the curb.  However, Ball, who had been standing between the other two women, was unable to move out of the way.

The motor home struck Ball and she fell beneath the rear wheel.  The others screamed at [Alexander] to stop the motor home; one person shouted, "You hit her!"  As it continued to back up, the motor home dragged Ball 10 feet and then stopped.

[Alexander] got out of the vehicle and walked around to the passenger side of the motor home.  He began to pull on Ball's body, which was stuck under the rear tire.  As [Alexander] pulled Ball's leg, it began to detach from her body.  Ball gasped for air, bleeding from her mouth and nose.

[Alexander] dropped Ball's body in front of the motor home's rear tire.  He climbed back into the motor home and drove it forward over Ball's body, which tumbled forward.

### The Aftermath

Henderson, who had remained nearby, saw Ball's body beneath the motor home and dialed 911.  Henderson saw [Alexander] pull on Ball's body and saw her gasp for air.

[Alexander] drove away at approximately 30 to 40 miles per hour, with Henderson following in his car.  In an effort to shake off Henderson, [Alexander] swerved from side to side.  Eventually, [Alexander] pulled onto a residential street, stopped the vehicle, got out, and approached Henderson's car.  Henderson and [Alexander] exchanged words and then [Alexander] jumped over a nearby fence.

Officer Joshua Dobson received a report of a hit and run and learned that a witness was following the suspect.  After learning of the suspect's location, Officer Dobson arrived at the scene.  Henderson informed the officer that [Alexander] had jumped several fences.

At a nearby intersection Officer Dobson saw [Alexander], shirtless and holding a rag in his hand.  After Officer Dobson took [Alexander] into custody, he noted [Alexander] had blood on his hands and shoes.  [Alexander] slurred his words and his eyes were watery.  [Alexander's] pocket yielded the key to the motor home, and his shirt was found on a driveway.

### Physical Evaluation of [Alexander]

Officer Keri Wilson performed a driving under the influence (DUI) evaluation of [Alexander].  Officer Wilson observed that [Alexander] smelled of alcohol and his eyes were watery.  [Alexander], who was uncooperative and belligerent, required assistance to stand and walk.

[Alexander] agreed to have blood drawn.  As a technician drew his blood, [Alexander] said, "[T]his uneducated bitch thinks I do drugs.  I ain't done any drugs.  I drank, but that's all."  The blood test revealed [Alexander] had a blood alcohol content of 0.19 percent.

### *Examination of the Crime Scene*

Officer Kelly Fox was the first officer at the scene.  Officer Fox saw Ball lying in the street and tire marks measuring 11 feet in length along the street.  Bloody T-shirts, shoes, and a piece of human tissue with drag marks lay in the street.  At least one of the T-shirts had been used to cover Ball's body.

### *Autopsy*

The forensic pathologist who examined Ball's body found numerous injuries consistent with being struck and run over by a motor vehicle.  Ball's face and chest revealed numerous bruises, lacerations, and abrasions, indicating the body had been dragged.  Bruising on Ball's hip appeared to have been caused by an impact with a hard object.  The pattern of bruising on Ball's shoulder matched a pattern that is left by a tire tread.

Fractures on Ball's left side were consistent with an injury from crushing.  Based on the location of bruises and fractures, the pathologist concluded a tire had run over Ball's body from shoulder to chest.

Injuries to Ball's right leg were the result of an object like a spinning tire causing friction and peeling off the skin.  Ball's right leg suffered multiple fractures consistent with crushing.  The injuries to her right leg were so severe that the lower part of the leg was partially detached from the upper leg and was held together only by skin and tissue.

### *Prior Convictions*

[Alexander] had prior convictions for driving under the influence of alcohol in 1987, 1999, 2000, and 2002.  [Alexander] had also been convicted of first degree residential burglary in 1982, assault with a deadly weapon in 2005, and grand theft in 2009.

### Defense Case

[Alexander] testified in his own behalf.  [Alexander] and Ball, who had been together six years, were engaged.  He bought the motor home from his parents because his house had recently burned down and he needed a place to live.  [Alexander] had never driven a motor home before that day.  Shorty drove the motor home from [Alexander's] parents' home because [Alexander's] license had been suspended.

Shorty and [Alexander] picked up Ball and Shorty's girlfriend and went to a nearby park.  During their four-hour sojourn, [Alexander] drank 10 beers.

Later that evening, the group drove to an intersection downtown.  [Alexander] saw Bristow and showed her the inside of the motor home.  An individual named George, with whom [Alexander] had recently quarreled about disrespectful comments George made to Ball, arrived.

George and [Alexander] began yelling at each other, and the disagreement degenerated into a physical fight.  [Alexander] kicked George in the head.  George threatened to "pop" the tires on the motor home.  Afraid George would damage the motor home, [Alexander] decided to move it.

-4-

[Alexander] got into the motor home, checked the rearview mirrors, and started the engine.  The engine began to stall, so [Alexander] pumped the gas pedal.  [Alexander] had no idea there was anything behind the motor home when he began to back up.  He did not hear people shouting.

As he backed up, [Alexander] felt the motor home climb over the curb and go onto the dirt.  He put the vehicle in drive and drove forward.  As he drove forward, [Alexander] looked in the mirror and saw someone rolling behind the motor home.  He slammed on the brakes, ran back behind the motor home, and discovered Ball.  She did not appear to be stuck under the tire, but [Alexander] did not see the extent of her injuries.  [Alexander] tried to lift Ball, but she was too heavy.  He asked Shorty to watch her while he drove around the corner to a fire station to get help.

[Alexander] missed the turn and ended up on the freeway.  He noticed Henderson following him.  Lost and crying, [Alexander] stopped the motor home and approached Henderson to ask him to call the police.  [Alexander] became paranoid and jumped over a fence into a yard, where he sat crying until the police arrived.

**Verdict and Sentence**

The court found [Alexander] guilty on all counts except vehicular manslaughter while intoxicated without gross negligence, and found all allegations to be true.[2] The court sentenced [Alexander] to an aggregate state prison sentence of 70 years to life plus 11 years: 45 years to life on count one, a consecutive 25 years to life on count four, a concurrent one-year term on count seven, a consecutive term of 10 years under section 667, subdivision (a), and a consecutive term of one year pursuant to section 667.5, subdivision (b).  Pursuant to section 654, the court stayed the prison terms imposed on count two, count five, and count six. . . .

FN2.   [Alexander] was convicted of murder in the second degree.

*People v. Alexander*, No. C068986, 2012 WL 5279149, *1-4 (Cal. Ct. App. Oct. 26, 2012).

Through counsel, Alexander appealed his conviction, arguing that: 1) there was

insufficient evidence of implied malice to support the second-degree murder conviction; 2) the

trial court erred by failing to stay California Penal Code § 654[2] the term imposed on the felony

hit and run conviction; 3) the court abused its discretion by imposing a consecutive term for the

---

[2]     Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  CAL. PENAL CODE § 654.

felony hit and run conviction; and 4) the court improperly ordered Alexander to submit to an

AIDS test.  By reasoned, unpublished decision issued on October 26, 2012, the Court of Appeal

agreed with Alexander that, because he had not been convicted of a sexual offense, the trial court

was not authorized to order an AIDS test.  *Alexander*, 2012 WL 5279149, at *7.  The appellate

court affirmed the judgment in all other respects.  *Id.*  Counsel for Alexander petitioned in the

California Supreme Court for review of the insufficiency of the evidence claim, which was

summarily denied on January 3, 2013.

Alexander then filed a *pro se* petition for a writ of habeas corpus in the state supreme

court.  He alleged that reversal was warranted because: 1) his conviction was obtained based on

the perjured testimony of Bristow; 2) Bristow was not a credible witness; and 3) the trial court

failed to recognize conflicts in Bristow's testimony.  He further argued in claim 4 that the

supreme court should "approve [his] opening brief by reversing denial."  The California

Supreme Court denied the petition without comment on January 15, 2014.

Alexander timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on

February 5, 2014.

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Alexander raises the four grounds for relief he

unsuccessfully raised before the California Supreme Court in his state habeas petition, which

largely attack the credibility of prosecution witness Louise Bristow.  He argues in grounds 1 and

2 that Bristow committed perjury and was not a credible witness.  He relatedly contends in

ground 3 that the trial judge failed to discern inconsistencies in Bristow's testimony.  Finally, he

requests that this Court "approve [his direct appeal] opening brief by reversing denial."

## III. STANDARD OF REVIEW

-6-

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Here, the last decision was a summary denial by the California Supreme Court on habeas review, which is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Although Alexander styles his Petition to assert four separate grounds for relief, the thrust of his Petition is that Bristow committed perjury and was thus not a credible witness, the trial court erred in failing to recognize the perjured testimony at trial, and the appellate court erred on state habeas review in failing to acknowledge the perjured testimony identified in Alexander's opening brief on direct appeal.

"[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnotes omitted).  The essential elements of

such successful claim are that (1) the testimony is false or perjured, (2) the prosecutor knew that the testimony was false or perjured, and (3) the false testimony was material. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001).

Here, however, Alexander fails to establish any of the three enumerated elements. He contends that Bristow's testimony was perjured because: 1) she testified that the motor home's transmission was a stick shift when it was actually automatic; 2) she testified that Alexander would sometimes go to his brother's house, but his only brother had been incarcerated since the early 1990s; and 3) she testified that she met Alexander and Bell four months before the murder and they had been homeless at the time, but Alexander did not become homeless until his house burned down 12 days before the murder. The record reflects, however, that the first two comments were fleeting comments of no consequence and, with respect to the third comment, Bristow only stated that she herself was homeless when she met Alexander and Bell. To the extent that Bristow's statements may have been incorrect, as the Ninth Circuit has noted, "it is established law that minor inconsistencies, not bearing on the heart of the case, do not make a witness perjurious." *Gudiel-Paul v. Ashcroft*, 31 F. App'x 467, 468 (9th Cir. 2002).[3]

Moreover, Alexander does not argue in his Petition, nor did he argue in his habeas petition in state court, that the prosecutor knew that Bristow's testimony was false. Finally, because Alexander did not dispute the essential elements of the case that he drove the motor home over Ball's body while he was intoxicated, he cannot establish that Bristow's allegedly-false testimony as to the transmission, Alexander's brother, and Alexander's homelessness had

---

[3]     Cited for persuasive value pursuant to Ninth Circuit Rule 36-3.

any bearing whatsoever on his case.  Because Alexander fails to show that Bristow's testimony was false or material or that the prosecutor knew that it was false, Alexander cannot prevail on any perjured testimony claim.

And because he cannot show that any alleged inconsistencies were material, the trial court cannot be faulted for failing to discern them.  Indeed, "federal habeas courts [have] no license to redetermine the credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."  *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).  Likewise, because Alexander's appellate brief did not establish a meritorious perjury claim, the California Supreme Court did not err in failing to grant habeas relief based on it.[4]

## V. CONCLUSION AND ORDER

Alexander is not entitled to relief on any ground raised in his Petition.

---

[4]     To the extent that Alexander's *pro se* Petition may be liberally construed, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), to assert a claim that the California Supreme Court failed to re-examine his appellate brief on habeas review, Alexander cannot prevail on such claim either.  Errors in the state-court post-conviction review process (such as a state habeas proceeding) are not addressable through federal habeas corpus proceedings.  *See, e.g.*, *Ortiz v. Stewart*, 149 F.3d 923, 939 (9th Cir. 1998); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997).

Moreover, it is not clear what Alexander alleges in his fourth ground for relief, which simply states, "Approve Appellant's opening brief by reversing denial."  Because Alexander alleges in the supporting facts only that "the truth was not told," the Court assumes that this ground relates only to his perjury claim, and the Court does not construe the Petition to additionally raise the claims he unsuccessfully asserted before the state courts on direct appeal.  Even if Alexander intended to raise those claims before this Court, Alexander has failed to properly do so, and they therefore would be denied on that basis.  *See Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations unsupported by a statement of specific facts do not warrant habeas relief); *see also Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) ("the petition is expected to state facts that point to a 'real possibility of constitutional error'" (citation omitted)); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: September 15, 2015.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge